53 F.3d 549
 1995 Copr.L.Dec. P 27,410, 34 U.S.P.Q.2d 1737
 PLAYBOY ENTERPRISES, INC. and Special Editions, Ltd.,
Plaintiffs-Counter-Defendants, Appellants-Cross-Appellees,
v.
Jennifer DUMAS and Jennifer Dumas, Inc.,
Defendants-Counter-Claimants, Appellees-Cross-Appellants.
 No. 639, Dockets 94-7500L, 94-7542XAP.
 United States Court of Appeals,
Second Circuit.
 Argued Dec. 8, 1994.
Decided May 5, 1995.
 
 Donald B. Verrilli, Jr., Washington, DC (Mark D. Harris, Jenner & Block, Washington, DC, Kenneth P. Norwick, Norwick & Schad, New York City, of counsel), for plaintiffs-counter-defendants, appellants-cross-appellees.
 Roger L. Zissu, New York City (Lisa Pearson, Laurence S. Rickles, Weiss Dawid Fross Zelnick & Lehrman, P.C., of counsel), for defendants-counter-claimants, appellees-cross-appellants.
 Alan J. Hartnick, New York City (Lawrence E. Abelman, Jeffrey A. Schwab, Nancy J. Mertzel, Abelman, Frayne & Schwab, of counsel), for Magazine Publishers of America, Inc., amicus curiae.
 Charles D. Ossola, Alexandria, VA (Lowe, Price, LeBlanc & Becker, of counsel), for American Soc. of Media Photographers and Graphic Artists Guild, amici curiae.
 Irwin Karp, Rye Brook, NY (John M. Kernochan, Law Office of Irwin Karp, of counsel), for Committee for Literary Property Studies, National Writers Union, and Volunteer Lawyers for the Arts, amici curiae.
 Before: OAKES, CARDAMONE and WINTER, Circuit Judges.
 OAKES, Senior Circuit Judge:
 Appellants Playboy Enterprises, Inc. and Special Editions, Ltd. (collectively "Playboy") appeal from a judgment entered on April 20, 1994 in the United States District Court for the Southern District of New York, Charles H. Tenney, Judge, following a bench trial and the entry of two opinions, dated September 9, 1993 and December 20, 1993 and reported at 831 F.Supp. 295 and 840 F.Supp. 256. The order dismissed Playboy's claim for declaratory judgment that Playboy is the sole owner of all right, title and interest of the copyrights of approximately 285 works of art created by Patrick Nagel which appeared in Playboy magazine from 1974 to 1984. The order also granted the counterclaim for copyright infringement of appellees Jennifer Dumas (Nagel's widow) and Jennifer Dumas, Inc. (collectively "Dumas"). Judgment is affirmed in part, reversed in part, and vacated in part, and the case is remanded.
 
 Background
 
 1
 The following is not disputed by the parties. Patrick Nagel was a freelance artist who from 1974 until his death in 1984 produced approximately 285 pieces of artwork which were published in Playboy magazine. From August 1975 until July 1984, at least one Nagel painting appeared in every issue of Playboy. At the outset, Nagel was given specific instructions by Playboy as to the content of the paintings--Playboy requested illustrations to accompany specific articles or particular letters for the 'Advisor' section of the magazine. The paintings were, not surprisingly, generally of nude women, in various poses. Sometime after January 1977 but before August 1978, Playboy stopped giving Nagel any specific instructions. Nagel and Playboy settled into a course of conduct whereby Nagel would routinely submit paintings and Playboy would generally publish his work. As the district court found, "as time went on, [Nagel] was given greater freedom to submit the paintings he wanted, which apparently matched what Playboy was interested in publishing." Playboy Enterprises, Inc. v. Dumas, 831 F.Supp. 295, 300 (S.D.N.Y.), modified, 840 F.Supp. 256 (S.D.N.Y.1993).
 
 
 2
 From 1974 until 1977, Playboy kept each piece of original artwork that was created for and delivered to it by contributors, including Nagel. Effective April 1, 1977, Playboy adopted a new policy of returning the original works to contributors.[1] Playboy stamped the following legend on each piece of work it returned:
 
 PLAYBOY'S ARTWORK
 REPRODUCTION
 PROHIBITED WITHOUT
 PLAYBOY'S PERMISSION
 
 3
 Playboy paid Nagel for each of the published paintings by check after Nagel delivered the work. He was paid $150 to $250 for a spot illustration, $800 for a full-page illustration, and $1200 for a double-page spread. Each check bore a legend endorsement.
 
 
 4
 The first 104 checks, issued between 1974 and July 1979, were stamped with the following legend ("Legend A"):
 
 
 5
 Any alteration of this legend agreement voids this check. By endorsement of this check, payee acknowledges payment in full for the assignment to Playboy Enterprises, Inc. of all right, title, and interest in and to the following items: [a description of a painting followed].
 
 
 6
 The next 60 checks, issued between September 1979 and approximately March 1981, were stamped with this legend ("Legend B"):
 
 
 7
 Any alteration of this legend agreement voids this check. BY ENDORSEMENT, PAYEE: acknowledges payment in full for services rendered on a work-made-for-hire basis in connection with the Work named on the face of this check, and confirms ownership by Playboy Enterprises, Inc. of all right, title and interest (except physical possession), including all rights of copyright, in and to the Work.
 
 
 8
 Finally, the last 94 checks, issued between March 1981 and May 1984, were stamped with this legend ("Legend C"):
 
 
 9
 Any alteration of this legend agreement voids this check. IT CONTAINS THE ENTIRE UNDERSTANDING OF THE PARTIES AND MAY NOT BE CHANGED EXCEPT BY A WRITING SIGNED BY BOTH PARTIES. BY ENDORSEMENT, PAYEE: acknowledges payment in full for the services rendered on a work-made-for-hire basis in connection with the Work named on the face of the this check and confirms ownership by Playboy Enterprises, Inc. of all right, title, and interest (except physical possession), including all right of copyright, in and to the Work.
 
 
 10
 At different times the checks were made out to Pat Nagel, Patrick Nagel Studios, Inc., Elias-Berman (an accountant), Raymond MacQueen (also an accountant), or The Art Factory (Nagel's artist's representative), and they were endorsed and deposited by Nagel himself, his bank, his corporation, his accountant or his artist representative. These endorsed checks constitute the only writings signed by Nagel or his representatives relating to Playboy's ownership of the copyrights in the works produced for Playboy.
 
 
 11
 In producing the paintings, Nagel used his own equipment, tools and materials. He worked at his own studio, on days and times of his own choosing. He hired his own assistants to do work at his studio, and at no time did Playboy withhold taxes from his pay or provide him with employee benefits. Throughout his career, including the time when he was producing work for Playboy, Nagel produced art for other companies, including American Express and Bank of America. He also painted privately commissioned work and exhibited his paintings in galleries.
 
 
 12
 Upon Nagel's death in 1984, his widow, Jennifer Dumas obtained copyrights and related ownership rights to Nagel's artwork. In 1988, she assigned all of her copyrights in Nagel's works to Jennifer Dumas, Inc. ("JDI"). Before his death, Nagel had entered into an agreement with Mirage Editions, Inc., providing for the publication and marketing of limited editions of reproductions of certain Nagel paintings. The posters and fine art reproductions published and sold by Mirage generated $21 million in sales revenues from 1984 to 1990, and another $2.5 million in 1991 and 1992.
 
 
 13
 In 1989, Dumas entered into agreements granting reproduction rights to third parties for all Nagel works which had previously appeared in Playboy magazine. Playboy brought an action in the Northern District of Illinois for copyright infringement. The parties settled the dispute by entering into an agreement which specified that Dumas and Playboy would each receive a certain percentage of the income generated by the exploitation of the Nagel works in question. The agreement was mutually terminated effective June 1, 1991.
 
 
 14
 In September 1991, Playboy brought this suit seeking a declaratory judgment that it is the sole owner of all copyrights in the Nagel paintings which had appeared in Playboy magazine. In June 1992, Playboy began marketing a collection of five silk screen reproductions and five offset productions of Nagel's artwork under the name "The Playboy Collection by Patrick Nagel." The works in the collection were all originally published in Playboy magazine, and all were created after 1978. In October 1992, Dumas filed an amended counterclaim for copyright infringement.
 
 
 15
 In the district court, Playboy argued that Nagel had transferred the copyrights in question to Playboy by means of the legend agreements on the checks. Alternatively, it argued that the Nagel paintings were "works for hire" under both the Copyright Act of 1909 and the Copyright Act of 1976, which thereby made Playboy the "author" of the works and the owner of the copyrights.
 
 
 16
 On September 9, 1993, following a bench trial, the district court issued an opinion and order holding that Nagel transferred only one-time reproduction rights to Playboy and that the Nagel works were not "works for hire." The court held, accordingly, that Playboy's Nagel Collection reproductions infringed copyrights owned by Dumas. This appeal followed.
 
 Discussion
 
 17
 The paintings at issue in this case were produced from 1974 to 1984. The Copyright Act of 1976, U.S.C. Title 17, ("the 1976 Act") took effect on January 1, 1978. Accordingly, the paintings produced before that date are governed by the Copyright Act of 1909 ("the 1909 Act"), and the paintings produced on or after that date are governed by the 1976 Act.
 
 
 18
 The district court chose to address first the issue whether the copyrights were transferred to Playboy, and then the issue whether the works were "made for hire." Because the work-for-hire issue determines the author of the works, and therefore who can later transfer the copyright, we discuss that issue first.
 
 I. Works For Hire Under the 1909 Act
 
 19
 The 1909 Act mentioned works for hire only in the definition section of the statute, where it specified that "[i]n the interpretation and construction of this title ... the word 'author' shall include an employer in the case of works made for hire." 17 U.S.C. Sec. 26 (1976) (repealed), reproduced in 5 Melville B. Nimmer & David Nimmer, Nimmer on Copyright ("Nimmer ") app. 6-26-29 (1994). Under this definition, an "employer" who hires another to create a copyrightable work is the "author" of the work for purposes of the statute, absent an agreement to the contrary. See, e.g., Tobani v. Carl Fischer, Inc., 98 F.2d 57, 59-60 (2d Cir.), cert. denied, 305 U.S. 650, 59 S.Ct. 243, 83 L.Ed. 420 (1938). The statute, however, did not define the terms "employer" or "works made for hire." Until the mid-1960's, federal courts applied the work-for-hire doctrine only to cases in which a traditional employer/employee relationship existed between the hiring party and the creator of the work. See Community for Creative Non-Violence v. Reid, 490 U.S. 730, 749, 109 S.Ct. 2166, 2177, 104 L.Ed.2d 811 (1989). In 1965, however, the Ninth Circuit applied the doctrine to a case in which an employer commissioned a work by an independent contractor. Lin-Brook Builders Hardware v. Gertler, 352 F.2d 298, 300 (9th Cir.1965). The court held:
 
 
 20
 [W]hen one person engages another, whether as employee or as an independent contractor, to produce a work of an artistic nature ... the presumption arises that the mutual intent of the parties is that the title to the copyright shall be in the person at whose instance and expense the work is done.
 
 
 21
 Id. We adopted that holding the next year in Brattleboro Publishing Co. v. Winmill Publishing Corp., 369 F.2d 565, 567-68 (2d Cir.1966), in which we held that an independent contractor is an "employee" and a hiring party an "employer" for purposes of the statute if the work is made at the hiring party's "instance and expense".
 
 
 22
 We have since defined the "instance and expense" test as being met "when the 'motivating factor in producing the work was the employer who induced the creation.' " Siegel v. National Periodical Publications, Inc., 508 F.2d 909, 914 (2d Cir.1974) (quoting Picture Music, Inc. v. Bourne, Inc., 457 F.2d 1213, 1216 (2d Cir.), cert. denied, 409 U.S. 997, 93 S.Ct. 320, 34 L.Ed.2d 262 (1972)). We have also held that in the work-for-hire context under the 1909 Act, "an essential element of the employer-employee relationship, [is] the right of the employer 'to direct and supervise the manner in which the writer performs his work.' " Picture Music, 457 F.2d at 1216 (quoting Donaldson Publishing Co. v. Bregman, Vocco & Conn, Inc., 375 F.2d 639, 643 (2d Cir.1967) (quoting Nimmer, Copyright Sec. 62.31 (1964)), cert. denied, 389 U.S. 1036, 88 S.Ct. 768, 19 L.Ed.2d 823 (1968)). See also Epoch Producing Corp. v. Killiam Shows, Inc., 522 F.2d 737, 744 (2d Cir.1975), cert. denied, 424 U.S. 955, 96 S.Ct. 1429, 47 L.Ed.2d 360 (1976) (the hallmark of "an employment for hire" is whether the employer could have exercised the requisite power to control or supervise the creator's work).
 
 
 23
 In Picture Music, we found that the song "Who's Afraid of the Big Bad Wolf" was a work for hire where the employers, Walt Disney Productions and Irving Berlin, recognized that the musical score of a cartoon could be adapted into a popular song, asked Ann Ronell to do the adaptation, and later paid her royalties in exchange for her work. We held that the employers "took the initiative in engaging Miss Ronell to adapt" the song and had the power to "accept, reject, or modify her work." 457 F.2d at 1217.
 
 
 24
 Conversely, in Siegel, we found that the comic strip character Superman was not a work for hire because although the creators revised and expanded the comic strip at the request of the publishers and were paid for that work, the Superman character was completely developed long before the employment relationship existed. 508 F.2d at 914.
 
 
 25
 Once it is established that a work is made for hire, the hiring party is presumed to be the author of the work. That presumption can be overcome, however, by evidence of a contrary agreement, either written or oral. Roth v. Pritikin, 710 F.2d 934, 937 n. 3 (2d Cir.), cert. denied, 464 U.S. 961, 104 S.Ct. 394, 78 L.Ed.2d 337 (1983). The burden of proof is on the independent contractor to demonstrate by a preponderance of the evidence that such a contrary agreement was reached. Real Estate Data, Inc. v. Sidwell Co., 809 F.2d 366, 371 (7th Cir.1987); Yardley v. Houghton Mifflin Co., 108 F.2d 28, 31 (2d Cir.1939), cert. denied, 309 U.S. 686, 60 S.Ct. 891, 84 L.Ed. 1029 (1940).
 
 
 26
 A. Were the Works "Made For Hire"?
 
 
 27
 The district court applied the instance and expense test to the Nagel paintings. It found that "[t]here is no doubt that Nagel was directed to create at least some of the works that appeared in Playboy prior to January 1, 1978. The portrait of Lillian Hellman, the art accompanying the Nellis article, and illustrations for features on travelers' aids (Playboy, March 1975) must have been 'motivated' or 'induced' by Playboy." Playboy, 831 F.Supp. at 311. The court made no specific findings as to whether any other particular paintings were made at the "instance" of Playboy, but concluded that "many of the Nagel works in the pre-1978 period were created at the instance of Playboy." Id. at 312. The court, however, held that the paintings were not works for hire because they were not made at Playboy's "expense." Although it was undisputed that Playboy paid Nagel a fee for each painting published by Playboy, the court concluded that the paintings were not made at Playboy's expense because "Nagel provided his own tools, worked his own hours, hired his own assistants, and paid his own taxes and benefits" and because "[t]here is no indication that there was any real risk involved for Playboy." Id. at 311.
 
 
 28
 Playboy argues that these factual findings support the conclusion that Nagel was working as an independent contractor rather than as a formal employee of Playboy, but not the conclusion that the paintings were made at Nagel's expense. Dumas argues that this is an issue of fact, and, accordingly, we may reverse the district court only if its decision was clearly erroneous.
 
 
 29
 The parties do not dispute the underlying facts set forth by the district court: Nagel provided his own tools, worked his own hours, hired his own assistants, and paid his own taxes and benefits. The question which is raised, in our view, is a mixed one which we review de novo: whether those facts, as a matter of law, show that the paintings were made at Nagel's rather than Playboy's expense. See Weissmann v. Freeman, 868 F.2d 1313, 1317 (2d Cir.), cert. denied, 493 U.S. 883, 110 S.Ct. 219, 107 L.Ed.2d 172 (1989) ("when a district court makes findings of fact predicated upon an incorrect legal standard such findings are not binding on an appellate court").
 
 
 30
 It appears that the district court used the wrong test to determine whether the works were made at Playboy's expense. The factors considered by the district court, as Playboy points out, are among the factors listed by the Supreme Court in Community for Creative Non-Violence v. Reid, 490 U.S. 730, 751-52, 109 S.Ct. 2166, 2178-79, 104 L.Ed.2d 811 (1989), which may be used to show that an artist worked as an independent contractor and not as a formal employee. The factors have no bearing on whether the work was made at the hiring party's expense.
 
 
 31
 Our prior cases on work for hire under the 1909 Act have found the "expense" requirement to be met where a hiring party simply pays an independent contractor a sum certain for his or her work. See Brattleboro, 369 F.2d at 568 (price paid by merchants to newspaper for advertisement fulfilled the "expense" requirement); Yardley, 108 F.2d at 31 ("expense" requirement met when artist was commissioned to paint a mural for pay). In contrast, where the creator of a work receives royalties as payment, that method of payment generally weighs against finding a work-for-hire relationship. See Donaldson Publishing Co. v. Bregman, Vocco & Conn, Inc., 375 F.2d 639, 642 (2d Cir.1967), cert. denied, 389 U.S. 1036, 88 S.Ct. 768, 19 L.Ed.2d 823 (1968); Everts v. Arkham House Publishers, Inc., 579 F.Supp. 145, 149 (W.D.Wis.1984); cf. Picture Music, 457 F.2d at 1216 (finding a work-for-hire relationship where payment was a percentage of royalties, holding that "[t]he absence of a fixed salary ... is never conclusive"). The simple fact that Playboy paid Nagel a fixed sum for each of the works published in Playboy magazine is sufficient to meet the requirement that the works be made at Playboy's expense.
 
 
 32
 As we find that all the works in this time period were made at Playboy's expense, any of those works which were also made at Playboy's instance, and which Playboy had the right to control or supervise, are works for hire under the 1909 Act. See Picture Music, 457 F.2d at 1216. The district court did not reach these issues because it held that the works were not made at Playboy's expense. The court, however, did make a number of factual findings which are relevant to these points.
 
 
 33
 The court found that "[t]here is no doubt that Nagel was directed to create at least some of the works that appeared in Playboy prior to January 1, 1978," Playboy, 831 F.Supp. at 311, and that "Nagel was given specific instructions for his early submissions to Playboy." Id. at 310. The court credited a statement made by Hugh Hefner, the former editor of Playboy magazine, that "At first we asked [Nagel] to illustrate a particular letter to the 'Advisor' every month, but soon ... [w]e asked him simply to give us a painting a month." Id.
 
 The court also found that:
 
 34
 Sometime after January 1977 but before August 1978, Nagel and Playboy fell into a course of conduct whereby Nagel would produce a few works for Playboy expecting them to be published; Playboy, in turn, expected to publish a few of Nagel's works.
 
 
 35
 Id. at 310-11. In addition, the court found that "Playboy apparently was no longer controlling characteristics of the works by mid-1978.... The instance [beyond mid-1978] cannot be determined. The relationship was a continuing one, and plaintiffs have offered no evidence of any specific orders after 1976." Id. at 313.
 
 
 36
 These findings show that the relationship between Playboy and Nagel evolved over time. The district court found that the evidence presented was insufficient to show the exact date on which Playboy ceased giving Nagel specific assignments. Its best estimate was "after January 1977 but before August 1978." From the court's findings we can draw the conclusion that at least during the time before January 1977, Playboy gave Nagel specific assignments and often asked him to illustrate particular articles that were to appear in Playboy magazine. It is safe to say that during this phase of their relationship, Playboy was the "motivating factor" in the creation of the paintings. Nagel certainly would not have created those particular paintings if he had not been given the assignments by Playboy. Thus, the paintings made during this time were made at Playboy's instance.
 
 
 37
 The district court also found that before mid-1978, Playboy not only had the right to control the works but it actually controlled certain characteristics of the paintings. Id. This, combined with the fact that the paintings created before January 1977 were made at Playboy's "instance and expense", makes those works "works for hire." The case, however, must be remanded for a determination of whether the paintings made after January 1977 but before January 1, 1978 were also made at Playboy's instance.[2]
 
 
 38
 B. An Agreement To the Contrary?
 
 
 39
 As noted above, once it is determined that a work is made for hire, the hiring party is presumed to be the author of the work, although this presumption can be overcome by evidence of an agreement to the contrary. The district court found evidence of such a contrary agreement. 831 F.Supp. at 312.[3]
 
 
 40
 The court reasoned that if Playboy and Nagel had intended a work-for-hire relationship, Playboy would have confirmed that relationship in the check legends. Instead, it found, Playboy chose to ratify the relationship with the language of Legend A, which indicates a general transfer of rights to Playboy. Id. Such an assignment of rights to Playboy, the court reasoned, "would not make sense if the parties presumed that Playboy would be the author of the work for statutory purposes," because if Playboy were the author, Nagel would hold no rights to the paintings and, thus, would have nothing to transfer to Playboy in Legend A. Id.
 
 
 41
 The court supported its conclusion with a reference to industry custom. See May v. Morganelli-Heumann & Assocs., 618 F.2d 1363, 1369 (9th Cir.1980) (industry custom may be used to prove parties' intent that works not be made for hire). The court found that from 1974 until January 1, 1978, the effective date of the 1976 Act, "the custom in the magazine industry was that absent explicit language to the contrary, a contributor transferred only one time reproduction rights in the work sold for publication." Playboy, 831 F.Supp. at 312. The court found that Legend A, which acknowledges an "assignment to Playboy Enterprises, Inc. of all right, title and interest in and to" the paintings, combined with the custom in the industry showed that the parties intended Nagel to remain the author of the works. Id.
 
 
 42
 Playboy challenges this finding. It argues that Legend A is not inconsistent with a work-for-hire agreement, which would make Playboy the author of the work for statutory purposes, because the 1909 Act only governed works after they were published. Before publication, all works were governed by common law copyright. The checks containing the Legend A transfer agreement were issued pre-publication, and Playboy argues that "[t]o protect Playboy's rights in the illustrations during this period, an assignment of the common law rights was necessary, and Legend Agreement A accomplished just that." Appellants' Brief at 32.
 
 
 43
 As we discuss more fully in Section III, we find it impossible to discern the intent of the parties from the language of Legend A. The legend acknowledges an assignment of rights, but it does not specifically mention copyright--let alone common law copyright. It could intend the transfer of a one-time use right, as the district court found, or of common law copyright, as Playboy argues, or of all rights--including both copyright and possessory rights. As Legend A is not clear, and as Playboy's explanation for the agreement is at least plausible, we are not convinced that the legend either proves or disproves that the parties intended something other than a work-for-hire relationship.
 
 
 44
 Further, we are not convinced by the district court's recourse to industry custom. The district court used evidence of custom to conclude that the parties intended that Nagel transfer only one-time reproduction rights to Playboy, and that he retain authorship and copyright in the paintings. The court, however, did not consider the impact of the fact, stipulated by the parties, that it was "the regular and consistent policy and practice of Playboy at all relevant times in this action to seek to acquire from all freelance writers, artists and photographers who contribute to Playboy magazine all rights, including copyrights, in and to their contributions." Joint Pre-Trial Order, Stipulated Facts, p 23. This practice is, of course, not conclusive of the intent of these particular parties because it sheds no light on Nagel's intent, but it clearly undercuts the import of the industry custom cited.
 
 
 45
 Given the controverted evidence of a contrary agreement between Playboy and Nagel, we conclude that it was clearly erroneous for the district court to find that Dumas met her burden of proving that the parties intended a relationship other than work for hire. Hence, by presumption, Playboy is the "author" of the works created before January 1, 1978 that were made for hire.
 
 II. Works For Hire Under the 1976 Act
 
 46
 The 1976 Act defines the contours of the work-for-hire doctrine in much more detail than its predecessor. The 1976 Act states:
 
 
 47
 In the case of a work made for hire, the employer or other person for whom the work was prepared is considered the author for purposes of this title, and, unless the parties have expressly agreed otherwise in a written instrument signed by them, owns all of the rights comprised in the copyright.
 
 
 48
 17 U.S.C. Sec. 201(b) (1988). The Act explicitly defines works made for hire:
 
 
 49
 A "work made for hire" is--
 
 
 50
 (1) a work prepared by an employee within the scope of his or her employment; or
 
 
 51
 (2) a work specially ordered or commissioned for use as a contribution to a collective work, as a part of a motion picture or other audiovisual work, as a translation, as a supplementary work, as a compilation, as an instructional text, as a test, as answer material for a test, or as an atlas, if the parties expressly agree in a written instrument signed by them that the work shall be considered a work made for hire....
 
 
 52
 17 U.S.C. Sec. 101 (1988).
 
 
 53
 The parties agree that Nagel was not a formal employee of Playboy when he produced the paintings at issue in this case, so the works are "works made for hire" only if they satisfy the requirements of Sec. 101(2). The parties also agree that Playboy magazine is a "collective work" within the meaning of the statute. Accordingly, we are left with two questions: 1) were the works "specially ordered or commissioned" by Playboy? and 2) as to each work in question, did the parties "expressly agree in a written instrument signed by them that the work shall be considered a work made for hire"? We consider the writing requirement first.
 
 A. The Writing Requirement
 
 54
 Section 101(2) requires that the parties "expressly agree in a written instrument signed by them that the work shall be considered a work made for hire." 17 U.S.C. Sec. 101(2) (1988). The checks issued by Playboy are the only writings signed by both Playboy and Nagel (or one of Nagel's representatives) relating to Playboy's ownership of the copyright in the works published in Playboy. The district court found that even assuming, arguendo, that the works meet all the other statutory requirements of Sec. 101(2), the check legends are not sufficient to meet the writing requirement of that section because they were signed after the creation of the works. Playboy, 831 F.Supp. at 314.
 
 
 55
 The court reasoned that a decision otherwise would render other sections of the Act redundant. It argued that work-for-hire agreements must be executed pre-creation; otherwise they are little more than transfers, which are governed separately under Sec. 204 of the Act. Id. The court also noted that Barbara Ringer of the U.S. Copyright Office testified before Congress that her understanding of the legislation that became the 1976 Act was that a work prepared on special order or commission would not be considered a "work made for hire" if the written agreement was signed after the work was created. Id. (citing H.R.Rep. no. 51-374, 89th Cong., 1st Sess., Part 5, 1964 Revision Bill with Discussion and Comments, at 145 (1965)).
 
 
 56
 The court also relied upon a Seventh Circuit decision, Schiller & Schmidt, Inc. v. Nordisco Corp., 969 F.2d 410 (7th Cir.1992) (Posner, J.), which held that Sec. 101(2) requires that a written agreement precede the creation of the work. Judge Posner reasoned that the requirement of a written statement "is not only designed to protect people against false claims of oral agreements." Id. at 412. Rather, "the signed-statement requirement in section 101(2) has a second purpose--to make the ownership of property rights in intellectual property clear and definite, so that such property will be readily marketable." Id. Accordingly, the court held that "[t]he writing must precede the creation of the property in order to serve its purpose of identifying the (noncreator) owner unequivocally." Id. at 413.
 
 
 57
 Playboy argues that this requirement of a pre-creation writing has no basis in the statute. Section 101(2), Playboy notes, is silent as to when the parties' "written instrument" must be executed. In response to the district court's conclusion that a post-creation writing would essentially be a transfer governed by Sec. 204 of the act, Playboy points out that a work-for-hire agreement would make the hiring party the "author" of the work, whereas a transfer would convey only ownership of the copyright. This difference, it argues, makes the transactions fundamentally different and thus not duplicative.
 
 
 58
 Playboy also argues that the requirement of a pre-creation writing is contrary to existing Second Circuit law. Playboy points to Eden Toys, Inc. v. Florelee Undergarment Co., 697 F.2d 27 (2d Cir.1982), in which we held that the "note or memorandum" of a transfer agreement, required by Sec. 204(a) of the 1976 Act, "need not be made at the time when the license is initiated; the requirement is satisfied by the copyright owner's later execution of a writing which confirms the agreement." Id. at 36.
 
 
 59
 We agree with the Seventh Circuit that the writing requirement was created, in part, to make the ownership of intellectual property rights clear and definite. The Supreme Court, in Community for Creative Non-Violence v. Reid, 490 U.S. 730, 750, 109 S.Ct. 2166, 2178, 104 L.Ed.2d 811 (1989) ("CCNV"), stated that one of Congress's goals in creating the work-for-hire provisions of the 1976 Act was to "ensur[e] predictability through advance planning." In CCNV, the Court rejected the petitioner's argument that independent contractors should be considered "employees" under Sec. 101(1) if their works were "actually controlled" by the hiring party. That interpretation, the Court reasoned, would "thwart" the purpose of Sec. 101 because it "leaves the door open for hiring parties, who have failed to get a full assignment of copyright rights from independent contractors falling outside the subdivision (2) guidelines, to unilaterally obtain work-made-for-hire rights years after the work has been completed." Id. (quoting Hamilton, Commissioned Works as Works Made for Hire Under the 1976 Copyright Act: Misinterpretation and Injustice, 135 U.Pa.L.Rev. 1281, 1304 (1987)).
 
 
 60
 Likewise, Congress's goal of "predictability" would be thwarted if a hiring party and an independent contractor could enter into a work-for-hire agreement years after a work was created. Prior to execution of such an agreement, the parties, as well as third parties, would act with the understanding that the independent contractor was the "author" of the work. Only after the parties agreed retroactively that the work was made for hire would the hiring party somehow become the "author". We also question whether Congress intended that a work could have two separate "authors"--one during the first phase of its existence, and another after a work-for-hire agreement were executed. We therefore find that the 1976 Act requires that the parties agree before the creation of the work that it will be a work made for hire.
 
 
 61
 We are not convinced, however, that the actual writing memorializing the agreement must be executed before the creation of the work. The Nimmers make a convincing argument in their treatise on copyrights that such a requirement could itself create uncertainty. They argue:
 
 
 62
 [O]ne can [ ] imagine claims involving parties each of whom knew of the unanimous intent among all concerned that the work for hire doctrine would apply, notwithstanding that some of the paperwork remained not fully executed until after creation of the subject work. In that [ ] circumstance, the bright line rule could frustrate the intent of the parties, and cloud rather than serve the goal of certainty.
 
 
 63
 1 Nimmer Sec. 5.03[B][b] (1994). They conclude that "perhaps this rule needs further testing in the crucible of fact patterns by future cases." Id. We agree. In the fact pattern of this case, we will assume that the writing requirement of Sec. 101(2) can be met by a writing executed after the work is created, if the writing confirms a prior agreement, either explicit or implicit, made before the creation of the work.
 
 
 64
 That leaves us with three questions: 1) whether the language of the legends was sufficient to meet the writing requirement of Sec. 101(2); 2) if so, whether Playboy and Nagel understood at the time the works were created that the works were made for hire, cf. Eden Toys, 697 F.2d at 36 (remanding to the district court to determine whether an oral transfer was made); and 3) whether the legend agreements were signed by both parties or by their authorized agents.
 
 1. Legend A
 
 65
 Legend A was stamped on the back of the checks issued from 1974 through July 1979. The legend reads:Any alteration of this legend agreement voids this check. By endorsement of this check, payee acknowledges payment in full for the assignment to Playboy Enterprises, Inc. of all right, title and interest in and to the following items: [a description of a painting followed].
 
 
 66
 This agreement does not mention a work-for-hire relationship. It only mentions an "assignment." It does not, therefore, satisfy the writing requirement of Sec. 101(2) that "the parties expressly agree in a written instrument signed by them that the work shall be considered a work made for hire." 17 U.S.C. Sec. 101(2) (1988). Therefore, the works created between January 1, 1978 (when the 1976 Act became effective) and July 1979 are not works for hire.
 
 2. Legends B & C
 
 67
 In contrast to Legend A, Legends B and C each contain language sufficient to meet the writing requirement of Sec. 101(2). Legend B, which was stamped on checks issued between September 1979 and March 1981, reads:
 
 
 68
 Any alteration of this legend agreement voids this check. BY ENDORSEMENT, PAYEE: acknowledges payment in full for services rendered on a work-made-for-hire basis in connection with the Work named on the face of this check, and confirms ownership by Playboy Enterprises, Inc. of all right, title and interest (except physical possession), including all rights of copyright, in and to the Work. (emphasis added).
 
 
 69
 Legend C, which was stamped on the checks issued between March 1981 and May 1984, reads:
 
 
 70
 Any alteration of this legend agreement voids this check. IT CONTAINS THE ENTIRE UNDERSTANDING OF THE PARTIES AND MAY NOT BE CHANGED EXCEPT BY A WRITING SIGNED BY BOTH PARTIES. BY ENDORSEMENT, PAYEE: acknowledges payment in full for the services rendered on a work-made-for-hire basis in connection with the Work named on the face of the this check and confirms ownership by Playboy Enterprises, Inc. of all right, title, and interest (except physical possession), including all right of copyright, in and to the Work. (emphasis added).
 
 
 71
 Since Legends B and C contain essentially identical language confirming that services were rendered by Nagel on a work-for-hire basis, they meet the statutory writing requirement if they were signed by both Playboy and Nagel and if Playboy can show that the parties had an understanding, before the creation of each work, that the works were to be made for hire.
 
 
 72
 At trial, neither party proffered any direct evidence of the intent of the parties before the creation of the works. As we discussed above, see Section I(A) supra, the evidence of industry custom and the evidence of Playboy's usual practice was conflicting. However, the parties' continued use of Legends B and C is sufficient to show that they intended a work-for-hire relationship. Playboy, by drafting the legends, clearly intended the works to be made for hire. For his part, Nagel, by endorsing Playboy's checks below Legends B and C, may be assumed to have consented to a continuing practice whereby any works he sold to Playboy would be considered works made for hire. While Nagel's endorsement of Playboy's first check bearing legend B may not evidence his pre-creation consent to a work-for-hire relationship, Nagel's subsequent pre-creation consent to such a relationship may be inferred from his continued endorsements. Therefore, beginning with the second check containing Legend B, Nagel's endorsement of Playboy's checks constitutes sufficient evidence that the parties agreed before the creation of each work that it would be made for hire.
 
 
 73
 The checks, however, were, as we have said, signed at various times by a number of different persons and entities--Nagel himself, his accountant, his bank, his artist's representative, and others. Our conclusion rests on the assumption that the checks were signed by Nagel himself or by an agent who was authorized to enter into a work-for-hire relationship on Nagel's behalf. The district court expressly reserved decision on the issue of whether the signatories (other than Nagel himself) had such authority. Playboy, 831 F.Supp. at 308 n. 13. Accordingly, the case must be remanded to the district court for a determination whether the checks were signed by agents authorized to enter into a work-for-hire relationship on Nagel's behalf.
 
 B. Specially Ordered or Commissioned
 
 74
 Since we conclude that Legends B and C may meet the writing requirement of Sec. 101(2), we next consider whether the works created after September 1979 (the date at which Legend B was first used) were "specially ordered or commissioned" by Playboy.
 
 
 75
 In addressing this question, the district court found that Congress intended to incorporate the "instance and expense" test into the statute through the phrase "specially ordered or commissioned." Playboy, 831 F.Supp. at 313. The Supreme Court has stated, the court noted, that "a party who hires a 'specially ordered or commissioned' work by definition has the right to specify the characteristics of the product desired." Id. (quoting CCNV, 490 U.S. at 741, 109 S.Ct. at 2173). In a footnote, the district court stated:
 
 
 76
 This court interprets the language of the Supreme Court to mean that the exercise of the right of artistic control by the party for whom the work is being prepared can be highly indicative of a commissioned relationship. However, this court believes that the waiver or absence of exercise of that right need not negate the possibility of a commission relationship. See Nimmer, Sec. 5.03[B][d], 5-44, n. 171.
 
 
 77
 Id. n. 19.
 
 
 78
 The court went on to hold that no work created after January 1, 1978 was "specially ordered or commissioned" as required under the 1976 Act. The court found that the issue of who controlled the characteristics of the works, if it had any weight at all, weighed in favor of Nagel because by mid-1978, Playboy no longer controlled these characteristics. Id. at 313. The court also found that it could not determine whether the works were made at Playboy's instance because Playboy offered no evidence of special orders after 1976. Playboy argued that the course of conduct of the parties should be sufficient, but the district court found that "determinations of works made for hire must be established on a work-by-work basis." Id. (citing Weissmann, 868 F.2d at 1317). Finally, the district court relied upon the fact that Nagel bore the expense of creation (because he supplied his own tools, etc., see Section I(A) supra ) as well as the risk "because there was no commitment on the part of Playboy to purchase the works." Id.
 
 
 79
 Playboy argues that the "instance and expense" test "is a relic of the 1909 Act," Appellants' Br. at 35, and has no place in an analysis of work for hire under the 1976 Act. It further urges that under the 1976 Act, "[i]f the parties claim in an agreement that they contracted on a work for hire basis, and if the particular work falls within one of the nine enumerated categories, the creator has received all the protection the Act contemplates." Id. at 34.
 
 
 80
 We find Playboy's characterization of the requirements of the 1976 Act incomplete. The statute specifies that the work must be either a work prepared by an employee within the scope of his or her employment, or a work "specially ordered or commissioned" and falling within one of nine categories. The legislative history sheds considerable light on the intent of the drafters: "The thought here is that, in the [nine] special cases specifically mentioned ... the work will be considered a work for hire, but only if it is in fact 'specially ordered or commissioned' for that purpose...." Supplementary Report of the Register of Copyrights on the General Revision of the U.S. Copyright Law: 1965 Revision Bill, 89th Cong., 1st Sess., Copyright Law Revision, pt. 6, p. 67 (emphasis added). The district court was thus correct to determine whether the paintings were "specially ordered or commissioned" by Playboy.
 
 
 81
 The issue, thus, becomes whether the district court properly interpreted the meaning of "specially ordered or commissioned." We first examine whether it was proper for the district court to consider the fact that Playboy no longer controlled the characteristics of Nagel's work. Two well respected commentators on copyright law are agreed that under the 1976 Act, the issue whether a work is "specially ordered or commissioned" is unrelated to the issue of which party has artistic control over the product. Professor Patry, in discussing the changes to the Copyright Act proposed in 1965 which were incorporated into the 1976 Act, states:
 
 
 82
 [T]he status of a work created by an independent contractor as a specially ordered or commissioned work made for hire ha[s] nothing to do with whether the commissioning party exercise[s] any (or complete) supervision and control over the independent contractor's work.
 
 
 83
 William F. Patry, Latman's The Copyright Law at 121 (6th ed. 1986). The Nimmers agree. In the section of their treatise relied upon by the district court, they note that while the fact that an artist retains artistic control over a work is "inconsistent with a 'for hire' relationship under the 1909 Act," it "is not necessarily inconsistent with a commission relationship" under the 1976 Act. 1 Nimmer, Sec. 5.03[B][d], n. 171.
 
 
 84
 We agree with these commentators that the hiring party need not possess or exercise artistic control over the product for a work to be "specially ordered or commissioned" within the meaning of Sec. 101(2). The district court took out of context the Supreme Court's comment in CCNV that "a party who hires a 'specially ordered or commissioned' work by definition has a right to specify the characteristics of the product desired." A hiring party, the Court noted, has this right "at the time the commission is accepted, and frequently until it is completed." CCNV, 490 U.S. at 741, 109 S.Ct. at 2173. In other words, a commissioning party may ask a contractor for any specific work at the outset of their relationship and may continue to make specific requests to the extent their contractual relationship allows. The Court explicitly rejected the "actual control" test that this court had articulated in Aldon Accessories Ltd. v. Spiegel, Inc., 738 F.2d 548 (2d Cir.), cert. denied, 469 U.S. 982, 105 S.Ct. 387, 83 L.Ed.2d 321 (1984), as being outside the scope of the statutory language. 490 U.S. at 742, 109 S.Ct. at 2173-74. Thus, the district court was in error to the extent that it based its conclusion that Nagel's works were not "specially ordered or commissioned" on the fact that by mid-1978 Playboy no longer actually controlled the characteristics of Nagel's work.
 
 
 85
 The issue whether the "instance and expense" test was incorporated into the statute through the words "specially ordered or commissioned" is even more difficult. The starting point for the interpretation of a statute is always its language. Consumer Product Safety Comm'n v. GTE Sylvania, Inc., 447 U.S. 102, 108, 100 S.Ct. 2051, 2056, 64 L.Ed.2d 766 (1980). The phrase "specially ordered or commissioned," the Court tells us in CCNV, denotes a commercial relationship in which a hiring party pays an independent contractor for his or her work. 490 U.S. at 742-43, 109 S.Ct. at 2173-74. This may arguably be equivalent to the "expense" prong of the old test. The words "specially ordered or commissioned" also imply that the hiring party has specifically asked the independent contractor for a work--arguably the "instance" prong.
 
 
 86
 The Nimmers, in their discussion of the meaning of "specially ordered or commissioned", state:
 
 
 87
 In the ordinary case where one person is requested by another to prepare a copyrightable work, a commissioned relationship exists. The surrounding circumstances, however, may indicate that this is not the case. The key factor would appear to be whether the "motivating factor in producing the work was the [person requesting preparation of the work] who induced [its] creation...."
 
 
 88
 1 Nimmer Sec. 5.03[B][d] (quoting Siegel v. National Periodical Publications, Inc., 508 F.2d 909, 914 (2d Cir.1974)) (footnotes omitted). The "motivating factor" test is, in fact, an interpretation of the "instance and expense" test under the 1909 Act. See Siegel, 508 F.2d at 914.
 
 
 89
 It appears, therefore, that the phrase "specially ordered or commissioned" has essentially the same meaning as "instance and expense". The district court applied the instance and expense test, but relied erroneously, as discussed in Section I(A), on its conclusion that the works were not made at Playboy's expense. We have held above that the paintings were made at Playboy's expense, and we find that the method of payment used by Playboy is consistent with a commission relationship. Thus, in order to determine whether the works created after July 1979 were "specially ordered or commissioned," the district court must determine whether the works were made at Playboy's instance--in other words, following the suggestion of the Nimmers, whether Playboy was the "motivating factor" in the creation of the works.
 
 
 90
 As discussed above in Section I(A), the district court found that sometime between January 1977 and August 1978, Playboy and Nagel had settled into a course of conduct whereby Nagel would produce paintings and Playboy would publish them. An employee of Playboy testified at trial that "at some point we told [Nagel] we are going to be running this and it looks like this is going to be a regular feature, but there was no commitment on either part that it couldn't be stopped at any point." Playboy, 831 F.Supp. at 311. The question is whether under this course of conduct Playboy was the "motivating factor" behind the creation of the paintings.
 
 
 91
 The evidence presented at trial shows that Playboy made specific requests for illustrations until at least January 1977, and perhaps until mid-1978. During those years, Nagel painted illustrations to accompany specific articles or letters. After mid-1978, however, Nagel was free to draw anything he liked. Hugh Hefner described the evolution of the relationship as follows:
 
 
 92
 At first, we asked [Nagel] to illustrate a particular letter to the 'Advisor' every month, but soon it was clear that trying to funnel such a large talent so narrowly was like telling Irwin Shaw or Ray Bradbury what to write about. We asked him simply to give us a painting a month. As it turned out, the painting he gave us invariably illuminated one, two, three or all of that month's 'Advisor' letters in a way no commissioned illustration ever had.
 
 
 93
 Id. at 310.
 
 
 94
 The district court on remand may find that during the second phase of their relationship Playboy was not the motivating factor behind Nagel's paintings. Playboy no longer made specific requests for paintings, and Playboy had no commitment to purchase any of Nagel's work. The evidence further shows that during this time an independent market existed for Nagel's work. Hence, the district court may find that the works were not "specially ordered or commissioned" by Playboy, and therefore were not works for hire under the statute.
 
 
 95
 Alternatively, the court may find that although Playboy was not assigning Nagel specific projects, Playboy and Nagel had an implicit understanding that Nagel would submit at least one work per month to Playboy. The evidence at trial showed that every issue of Playboy from August 1975 to July 1984 contained at least one Nagel illustration. Additionally, the evidence showed that after 1978, Nagel was paid for approximately 20 to 30 paintings which he submitted but which Playboy did not publish. Playboy's payment for paintings which it did not publish would support the conclusion that the parties understood that Playboy implicitly requested paintings each month. The district court may, therefore, also conclude on remand that the paintings made after mid-1978 were "commissioned" within the meaning of the 1976 Act.
 
 III. Transfer
 
 96
 Because we find that all of Nagel's works created before January 1977 are works made for hire, and that, accordingly, Playboy is their "author", we need not address whether Nagel transferred copyright in those works to Playboy by Legend A. We also need not address whether copyright in Nagel's works created from January 1977 through January 1, 1978 (governed by the 1909 Act) and Nagel's works created from September 1979 through 1984 (governed by the 1976 Act) were transferred by the check legends because the issue will not arise unless the district court finds that the works were not made for hire.
 
 
 97
 We have held, however, that Nagel is the "author" of works created between January 1, 1978 and July 1979. Accordingly, we address whether the copyrights in those works, governed by the 1976 Act, were transferred from Nagel to Playboy by Legend A.
 
 The 1976 Act provides that:
 
 98
 A transfer of copyright ownership, other than by operation of law, is not valid unless an instrument of conveyance, or a note or memorandum of the transfer, is in writing and signed by the owner of the rights conveyed or such owner's duly authorized agent.
 
 
 99
 17 U.S.C. Sec. 204(a) (1988). The legend agreements on the backs of the checks issued by Playboy as payment to Nagel are the only writings signed by Nagel or Nagel's agents that could arguably convey copyright to Playboy. We must therefore examine whether those writings are sufficient to satisfy Sec. 204(a).
 
 
 100
 Legend A, which was stamped on the checks for works created between January 1, 1978 and July 1979, states that "payee acknowledges payment in full for the assignment to Playboy Enterprises, Inc. of all right, title and interest in and to the following items: [a description of a painting followed]." The district court found the legend to be ambiguous because it does not mention the word "copyright," and because it transfers rights to "items" while "ownership of copyright in a work is distinct from ownership of the material object." Playboy, 831 F.Supp. at 308. The court also noted that the language does not describe a present transfer; it confirms a previous transfer of rights. Id. at 309. Playboy, however, "introduced no credible evidence as to any existing prior agreement." Id. at 305. Accordingly, the court concluded, "[g]iven the lack of evidence surrounding the agreements said to underlie checks bearing Legend A ... Legend A was insufficient, by itself, to transfer copyright ownership in any of the Nagel works." Id. at 309.
 
 
 101
 Playboy argues that the plain meaning of the phrase "assignment ... of all rights, title and interest" includes the assignment of all copyrights. It notes that after April 1, 1977, Playboy returned artwork to Nagel bearing a stamp stating "Playboy's artwork[;] reproduction prohibited without Playboy's permission." Since a copyright owner controls reproduction of a work, Playboy argues, the stamp shows that the parties understood that Nagel had transferred copyright in the works to Playboy. At the very least, Playboy contends, Nagel never objected to the stamp, thereby acquiescing in its contents through his course of action.
 
 
 102
 The Seventh Circuit, in Schiller & Schmidt, Inc. v. Nordisco Corp., 969 F.2d 410 (7th Cir.1992), found a transfer agreement that did not mention "copyright" sufficient to meet the writing requirement of Sec. 204(a). "It is true that the Copyright Act requires that assignments be in writing," the court reasoned, "but we have the writing.... [T]he issue is its interpretation." Id. at 413. The court concluded from the circumstances surrounding the agreement that the parties intended to transfer copyright by the agreement. Id.
 
 
 103
 Here, the district court found it impossible to determine the intent of the parties, and we cannot find the court's decision clearly erroneous. Legend A does not expressly mention copyright. While we do not agree with the district court that the parties could have intended to transfer only physical pieces of artwork, we believe, as we discuss above in Section I(B), that the evidence is conflicting as to whether the parties intended a one-time transfer of reproduction rights or a transfer that included copyright. We also believe the district court was within its prerogative to determine that the stamp on the back of the artwork was not indicative of an understanding between the parties. Given the ambiguity of the agreement and the accompanying circumstances, we must defer to the district court's determination that Legend A is insufficient to meet the writing requirement of Sec. 204(a).
 
 Conclusion
 
 104
 For the reasons stated above, the judgment of the district court is affirmed in part, reversed in part, and vacated in part, and the case is remanded for a determination of whether the works created between January 1977 and January 1, 1978 were made at Playboy's "instance", whether the persons who endorsed the checks on Nagel's behalf from September 1979 to May 1984 were authorized by Nagel to enter into a work-for-hire agreement, whether the works during that time period were "specially ordered or commissioned" within the meaning of the 1976 Act, and, if necessary, whether Nagel transferred copyright in the works created in the above-mentioned time intervals to Playboy by means of the check legends.
 
 
 105
 We hold that the works created before January 1977 were works for hire under the 1909 Act and, because Dumas failed to meet her burden in proving an agreement to the contrary, Playboy is the "author" of those works and owns their copyrights. We hold that the works created between January 1978 and July 1979 were not works for hire because Legend A does not meet the writing requirement under the 1976 Act, and we uphold the district court's finding that copyright in those works was not transferred by Legend A and therefore remained with the artist. Judgment in accordance with opinion.
 
 
 
 [1]
 The parties agree that physical possession of the original work is not determinative of the ownership of the reproduction rights to the work
 
 
 [2]
 To this end, if the district court finds that Playboy stopped giving Nagel specific assignments before January 1, 1978, our discussion of "instance and expense" in Section II(B) may provide guidance
 
 
 [3]
 The district court held that even if the instance and expense test was met, the works were not made for hire because of this agreement. Id. This finding is in error because once the instance and expense and the right to control the product tests are met, the works are for hire under the 1909 Act. An agreement to the contrary contracts around the statutory presumption and only changes which party is considered the author of the work