In re **MARVEL ENTERTAINMENT GROUP, INC.; The Asher Candy Company; Fleer Corp.; Frank H. Fleer Corp.; Heroes World Distribution, Inc.; Malibu Comics Entertainment, Inc.; Marvel Characters, Inc.; Marvel Direct Marketing Inc.; and Skybox International, Inc., Debtors.**

No. Civ.A. 97–638–RRM.

United States District Court,
D. Delaware.

Nov. 6, 2000.

818

Joseph Grey, Stevens & Lee, P.C., Wilmington, DE, Michael R. Diliberto, Adrian R. Askarieh, Kleinberg & Learner LLP, Los Angeles, CA, for Marvin A. Wolfman.

David B. Stratton, Pepper Hamilton LLP, Wilmington, DE, David Fleischer, Jodi A. Kleinick, Battle Fowler LLP, New York City, for Marvel Enterprises, Inc.

John D. Demmy, Morris, James, Hitchens & Williams, Wilmington, DE, Louis P. Petrich, Daniel Mayeda, Leopold, Petrich & Smith, P.C., Los Angeles, CA, for New Line Productions, Inc.

## OPINION

McKELVIE, District Judge.

This is a bankruptcy case. Marvel Entertainment Group, Inc. and certain subsidiaries, including Marvel Characters, Inc., filed petitions for relief under Chapter 11 of the United States Bankruptcy Code on December 27, 1996. On November 11, 1997, this court withdrew the reference from the bankruptcy court and took jurisdiction of the Marvel bankruptcy. This court confirmed a plan of reorganization for Marvel on July 31, 1998 and retains jurisdiction over matters related to the bankruptcy.

New Line Cinema Corporation, the successor in interest to Katja Picture Corporation, obtained a license from Marvel Entertainment on December 24, 1993 to produce one or more live action motion pictures based on a character called Blade. The Blade story includes other fictional entities from Marvel's panoply of characters, including Deacon Frost.

Marvin A. Wolfman is a comic book script writer and a former employee of Marvel.

On January 24, 1997, Wolfman filed a pro se proof of claim ("Claim 342") in the bankruptcy proceeding of Marvel Entertainment Group and Marvel Characters asserting ownership over seventy-five fictional characters including Blade and Deacon Frost. On July 21, 1998, Marvel filed an omnibus objection to a number of claims, including those brought by Wolfman. Wolfman did not file a written response to the objections or appear at the August 20, 1998 omnibus hearing in defense of his claim. Consequently, this court entered an order expunging the claim.

On August 20, 1998, Wolfman filed a complaint in the District Court for the Central District of California against Marvel Entertainment, Marvel Characters, and New Line Cinema Corporation seeking damages for, *inter alia*, copyright infringement, unfair competition, and interference with prospective economic advantage. Eight days later, Wolfman filed a voluntary dismissal of the suit against Marvel Entertainment and Marvel Characters. On August 30, 1998, the Central District of California entered an order dismissing Wolfman's claims without prejudice.

On October 26, 1998, Wolfman filed a motion with this court for reconsideration of the August 20, 1998 Order expunging Claim 342 and a motion for leave to pursue his claim in the Central District of California. On January 7, 1999, this Court grant-

ed the motion for reconsideration and denied Wolfman's motion for leave to pursue his claim in the Central District of California.

On January 27, 1999, Marvel Characters commenced an action against Wolfman seeking a declaration that Marvel Characters was the sole and exclusive owner of Blade and Deacon Frost and damages for Wolfman's violation of § 362 of the Bankruptcy Code, tortious interference with contract, and defamation.

On February 24, 1999, Marvel and Wolfman entered into a stipulation agreeing to resolve the disputes from the Wolfman litigation in the Central District of California and the Marvel Characters litigation in the District of Delaware in the context of Claim 342 in this court. On August 4, 1999, New Line intervened in the litigation on the side of Marvel objecting to Claim 342 and requesting a declaration that Marvel Characters is the sole and exclusive owner of Blade and Deacon Frost.

This court held a three-day non-jury trial on the issue of ownership over the disputed characters on November 15, 16, and 17, 1999. At trial, Wolfman asserted ownership over seventy-one characters.[1] This is the court's post-trial opinion on those issues.

## I. FACTUAL BACKGROUND

The court finds the following from the evidence at trial.

This is a dispute about the ownership of certain characters created by Wolfman throughout his career. The court will first provide a chronological overview of Wolfman's career, then provide a discussion of the development of the particular characters in the proof of claim.

### A. Wolfman's Career

Marvin Wolfman is a writer and creator of fictional stories and characters. Wolf-man has used his stories and characters in a variety of media contexts including print, television, and movies. Primarily, however, Wolfman has written and produced comic books.

#### 1. Wolfman's Fanzines

In the early part of his career, from 1963 to 1968, Wolfman created and published a series of short fan magazines called fanzines. Wolfman published the fanzines periodically and sold them commercially; they contained illustrated stories, written stories and articles organized around a specific theme. Wolfman's fanzines, titled "The Foob," "Super Adventures," "What Th__?," and "Stories of Suspense," covered different genres including comedy, super hero adventures, horror, and suspense. Although Wolfman published these fanzines, he was only one of many contributing authors and artists.

Wolfman stated that all of the authors that published with his fanzines retained the rights to their individual stories. As evidence of this relationship, Wolfman testified that in 1965 he published a story by Stephen King titled "In a Half World of Terror" in the fanzine, "Stories of Suspense." Wolfman further testified that despite publishing this story in his fanzine, Wolfman held no ownership rights in the story or the characters.

#### 2. DC Comics, Skywald, and Warren

In 1968, DC Comics hired Wolfman as an independent contractor to write stories and scripts for its comic books. In this time frame, DC Comics and Marvel Comics were two of the largest publishers of comic books. As a freelance writer, Wolfman wrote stories for characters already in use at DC Comics. Wolfman continued his freelance work with DC Comics until at least 1971. According to Wolfman, he was aware of DC Comics' policy regarding ownership of characters from the first day he submitted a story to the company.

---

1. In Claim 342, Wolfman asserted ownership over seventy-five characters. At trial he only claimed ownership over seventy-one characters. Wolfman no longer claims ownership of the characters Death Stalker, Midnight Publishing, Robert Ryder, or The Pool of Blood.

Wolfman states that Murray Boltinoff, the editor to whom Wolfman first submitted material, informed Wolfman that DC Comics would retain the rights to any story or character submitted and ultimately bought by the company.

Concurrent with his freelance work at DC Comics, Wolfman had other independent contracts. Wolfman wrote comic book stories for Skywald Publishing Co. and Warren Publishing Co. Throughout this time, Wolfman continued to generate stories and characters on his own for future use in comic books.

Wolfman testified that he retained ownership rights in several of the characters that he created and published with these smaller companies. As an example, Wolfman testified that he created a character called the Love Witch that he originally published in "Psycho," a Skywald Publication. Further, Wolfman stated that in 1989, Malibu Comics, believing that it had purchased the rights to the Love Witch in a Skywald bankruptcy auction, attempted to reprint Wolfman's creation. Wolfman stated that he and Malibu reached an agreement whereby Malibu would pay Wolfman a nominal fee for use of the story, put the copyright to the story in Wolfman's name, and credit the artist of the redrawn story on the cover of the book.

### 3. *Marvel Comics*

In late 1972, Wolfman began his relationship with Marvel Comics. Originally, Roy Thomas, Marvel's Editor–In–Chief, hired Wolfman to work on a bi-monthly comic series called "The Tomb of Dracula." Thomas brought Wolfman into Marvel to write issue number seven of "The Tomb of Dracula" because Thomas was not happy with the direction that the authors of the first six issues had taken. At that time, Wolfman did not want to work on "The Tomb of Dracula" because it was not one of Marvel's high profile comics, but he accepted the freelance work as a means of securing future writing assignments with Marvel.

Despite his initial reluctance to write for "The Tomb of Dracula," Wolfman continued his work on that comic for over seven years and sixty-five issues. Throughout that time, Marvel expected Wolfman to develop new script ideas for the bi-monthly publication. At trial, Wolfman and Marvel agreed that authors had to create and introduce new characters into plots to keep the stories interesting and fresh.

Although he consistently worked on "The Tomb of Dracula," Wolfman wrote for other comic titles during his time at Marvel. From 1972–1979, Wolfman wrote for titles such as "Dracula Lives," "Giant Size Chillers," "Daredevil," "Doctor Strange," "Powerman," "Sub–Mariner," "Skull the Slayer," "Spider–Woman," "Fantastic Four," "The Man Called Nova," and "The Amazing Spider–Man." Marvel paid Wolfman according to the number of pages he produced for each of these titles.

In 1975 and 1976, Wolfman served as the Editor–In–Chief of Marvel Comics. In late 1976 or early 1977, Wolfman signed a Writer/Editor Agreement with Marvel Comics which took effect on January 1, 1977 and secured Wolfman's employment for three years. The agreement defined the scope of employment in Paragraph 1 stating, "Marvel hereby employs Employee and Employee hereby agrees to render services to Marvel, as a writer/editor for Magazines heretofore and hereinafter published by Marvel." The agreement also had several provisions that dealt with the ownership of stories and ideas. Paragraph 7 stated:

> *Rights to Material.* Employee grants to Marvel the sole and exclusive right to all Material delivered to Marvel hereunder including, but not limited to, (a) the exclusive right to secure copyrights in the Material in the United States, Canada, and throughout the world, (b) the magazine rights therein of every kind, (c) all film and dramatic rights of every kind, (d) all anthology, advertising and promotion rights therein, and (e) all reprint

rights, except as provided in Paragraph 3(g) hereof. The exclusive rights herein granted shall pertain to all languages throughout the world and shall be Marvel's property for the period of the copyright and any renewals thereof.

Paragraph 3(a) of the agreement defined Material stating:

For the full and faithful performance of Employee's duties and for all services to be provided Marvel hereunder, Marvel shall pay Employee ... a salary based on $23.00 per page for each color comic page of script, plus $50.00 for the editing of each 17 page color comic script and the writing of a letters page for same ... written for Marvel and accepted by the Publisher of Marvel (herein after called 'Material').

Lastly, paragraph 10 stated "If any Material delivered hereunder is part of a series, the idea and the character or characters used therein shall constitute Marvel's exclusive property for all times." Wolfman left Marvel at the expiration of that contract in December of 1979.

Wolfman testified that, in contrast to DC Comics, Marvel did not have an explicit company-wide policy regarding the ownership of characters created for publication. Wolfman stated that prior to signing the 1977 Writer/Editor Agreement, he had not discussed the ownership of characters with anyone at Marvel. Wolfman further testified that he assumed that the authors at Marvel would own the rights to the characters they created in the same fashion authors had owned characters at Warren and Skywald. In support of this, Wolfman and Mark Evanier, a comic book industry historian, testified that comic book publishers did not have a common practice with regard to the ownership of copyrights. Therefore, according to Wolfman, he made a reasonable assumption as to his rights vis-a-vis the characters he created.

Marvel contends that it had a standard policy reserving to itself the rights to the characters and stories that it published

and that Wolfman knew of the policy. Moreover, Marvel states that it followed the custom of all major comic book publishing companies of that time. As proof of those claims, Marvel points to several practices in place at Marvel during Wolfman's tenure.

At trial, Millicent Shuriff, a bookkeeper at Marvel for forty-two years, testified that Marvel stamped the back of every check issued to freelance artists during Wolfman's tenure with a legend which confirmed that the check constituted payment for delivery of material produced at Marvel's instance and expense. The legend read:

By acceptance and endorsement of this check payee acknowledges a) full payment for payee's employment by Marvel Entertainment Group, Inc., b) that all payee's work has been within the scope of that employment, and c) that all payee's works are and shall be considered as works made for hire, the property of Marvel Entertainment Group, Inc.

Wolfman testified that he never received checks from Marvel that contained this language on the back. Marvel, however, employed Wolfman as a freelance writer from 1972 to 1976. Other Marvel employees confirmed that during this time they received checks that bore this legend.

Marvel also introduced evidence at trial that starting in 1974 Marvel returned original artwork to the artists if the artists would sign an artwork release. The release confirmed that Marvel retained all rights to the material depicted in the artwork. In relevant part, the Artwork Release stated:

Although the Marvel Comics Group is transferring the rights in the physical artwork, it is acknowledged that the Marvel Comics Group retains all other rights in and to the material including all copyright, trademarks and other rights therein subsisting.

The author/artist acknowledges that all services performed in connection with

this artwork have been rendered as an employee-for-hire of the Marvel Comics Group.

It is specifically understood that pursuant to the U.S. copyright law, only the copyright proprietor (here, Marvel) may license the copyright use of the artwork including the right to publicly exhibit the same. Marvel will be happy to consider granting the author/artist or his assignee the right to publicly exhibit this artwork, upon such person's written request.

Wolfman testified that Marvel did not use these releases until 1978. To the extent that Wolfman admitted signing any of these releases, Wolfman testified that he believed that the releases were for the actual art, not for the characters or ideas contained in the art.

### B. *Characters in Dispute*

Of the seventy-one characters in dispute, Wolfman contends that he created five characters prior to his relationship with Marvel. The court will discuss the development of those characters in detail first. This analysis will serve to illuminate one of the major issues in this case—whether or not Wolfman created certain characters prior to his employment with Marvel comics. The court will then discuss the creation and introduction of the characters developed by Wolfman prior to signing the 1977 Writer/Editor Agreement. Lastly, the court will discuss the characters Wolfman developed after January 1, 1977.

In analyzing the similarities or differences in comic book characters, a reader must take notice of more than the characters name, powers, and costume. The reader must consider the character's background story, which includes the story of origin and the character's alter ego, personality, and mission.

### 1. *Black Nova or Nova*

#### a. *Black Nova*

Wolfman first introduced the Black Nova character in 1967 in issue number six of his fanzine "Super Adventures." Wolfman used the same character again the next year in issue number nine of "Super Adventures." These issues describe the background story of Black Nova.

Black Nova was created when an evil alien named Celestial Man, also known as Kraken Roo, hit a super hero named Star with a power beam during a fight. Star depended on power pills for his super powers. The beam split Star into two separate beings and fused the power pills into the essence of the new beings. This relieved the new beings from Star's dependence on the power pills. One of the new entities became the super hero called Black Nova. Celestial Man killed the other being in battle. Black Nova, like Star before him, was a member of the team of super heros known as the Law Legion.

The 1967 Black Nova character had a black suit with a white belt. He had a logo on his chest with five stars in the shape of an "X." His belt also had a star. He wore a sleeveless shirt with points that flared out past his shoulders. He had a helmet that covered all of his face except his mouth. And, he had black armbands. The denotation "Black" did not refer to the character's race, but rather the color of his costume.

Black Nova had an unspecified set of powers that included cosmic force rays. Although Black Nova did not have the power of flight, he wore "Sky Skates" that gave him the power to fly through the air.

#### b. *Nova*

In 1976, Wolfman wrote and Marvel published a comic named "A Man Called Nova." Issue number one described the origin and background of this character. Nova gained his power when a dying alien, called the Centurion or Nova Prime, transferred his powers to a teenager named Richard Rider. In transferring his powers, the Centurion also transferred his mission to avenge the destruction of his planet. As Nova, Richard Rider tries to

fulfill both the Centurion's mission and a mission to fight all evil.

The 1976 Nova character had a similar costume to that of the 1967 character with certain exceptions. Like the 1967 character, the 1976 character wore a black costume with a white belt. He wore a sleeveless shirt with points that flared past his shoulders. Both characters wore black armbands. Like the 1967 incarnation, the 1976 Nova character was white. However, unlike the 1967 character, the 1976 character's belt did not have a star and instead of five stars on his chest, the 1976 Nova had only three stars in the shape of a "V." His helmet had also changed. While the 1976 character's helmet retained much of the shape of the 1967 character's costume, in 1976 it contained a star and a point that rose over the top of the helmet.

In the first issue, the 1976 Nova had super strength, could pick up police radio signals in his helmet, and could fly. The cover states that Nova is a "human rocket." The end of the comic intimates that Nova had other unspecified and undiscovered powers.

### 2. Janus

#### a. 1970 Janus

In 1970, Wolfman prepared a script for Dick Giordano, an editor at DC Comics. This script is a detailed precursor to a potential comic. It describes the basic story, the proposed art for each panel, and the words that would appear in each panel of the comic. Wolfman testified that he offered the script for publication while he worked for DC Comics and it was accepted. Wolfman stated at trial that prior to publication he withdrew the script because DC Comics would not allow him to own the rights to the Janus character.

The 1970 script described Janus stating, "He is tall (7 ft) nobel [sic] and frightening looking. Somber. His skin is yellows highlighted with browns, his eyes are flaming red, his hair stark white. His costume is in shades of browns and reddish browns. A sword, strangely decorative and menac-

ing is hanging by his side." He was the son of Asmodeus and a mortal woman. Wolfman testified that he meant Asmodeus to represent the Devil.

In the 1970 script, Janus learned love and compassion from his mortal mother. His mission was to stop the ascendency of Asmodeus from inner hell to Earth. Janus escaped from inner hell without Asmodeus's knowledge and took the form of a dead human named Jason Fleet to hide his location. As Jason Fleet, Janus attempted to thwart the plans of Asmodeus.

#### b. 1977 Janus

Marvel slowly introduced the Janus character into the publication "The Tomb of Dracula" with stories beginning in issue number fifty-two in 1977. Marvel used Janus in several issues throughout the next couple of years.

As the court understands the Marvel version of the Janus story, the vampire Dracula defeated an agent of God in a battle. The spirit of the defeated agent, however, did not dissipate, but transferred into Dracula's unborn child. The child was carried by Domini, the human bride of Dracula. After Domini gave birth, Janus grew to full adulthood in several days. Motivated by the agent of God, Janus's mission was to defeat his father, Dracula.

In issue number sixty two of "The Tomb of Dracula" the artist depicted Janus as a tall man with white hair, red eyes, and golden skin. He was dressed in a white and blue leotard. He carried no weapons. He had the power of flight and super strength and could transform into a golden eagle.

### 3. Skull the Slayer

Skull the Slayer first appeared in publication in 1975 in the Marvel Publication "Skull the Slayer." Wolfman claims, however, that he generated the idea for Skull the Slayer four years earlier when he was still working for DC Comics. As proof of this claim, Wolfman offered into evidence a note written in the letters page of the first

issue of "Skull the Slayer." Marvel also points to these comments to argue that Wolfman radically altered his basic idea for Skull the Slayer by the time it was published at Marvel.

For the sake of completeness, the court has reproduced several paragraphs of that note here (italics in original).

It's been *four years!* Four years since I tried selling the basic concept of SKULL THE SLAYER to someone . . . anyone. And now, at long last, for better or worse (though I naturally think the better)—its *here!* . . . I think it was worth the wait. For, in that time, my ideas matured, some concepts grew, some changed, all hopefully improved. The basics are still there—the thrust of what I wanted remains. Only some of the Secondary aspects of the series have been changed—and all for the better.

As I said it began four years ago when I was working as an assistant editor for Marvel's Declining Competition.[2] I had the idea for a then very *different* sort of magazine. The concept was simply: thrust an entire midtown Manhattan office building into a prehistoric setting—into a jungle inhabited by dinosaurs, and observe how us sedentary modern-types would cope on a totally alien, yet familiar, world.

. . .

Rascally Roy Thomas made me an editorial offer I couldn't refuse, and so I brought myself and Skull with me. But duties kept me from suggesting the idea until March of 1974. Roy thought about Skull for a few moments and said that he, too, was a dinosaur buff, that he had always wanted to do a similar type strip, and that if Stan said fine, we'd go with it. Stan did.

Roy and I began working out the details. He felt that [sic] apartment house idea was not feasible. It would spread the focus of our plots too thin,

and, to be a commercially acceptable book, it would not have one solid star.

The story as published does not include the midtown office building as originally suggested. Rather, the premise of "Skull the Slayer," as published by Marvel, is that an airplane traveled through a cosmic warp and the passengers end up in the prehistoric era. Jim Skulley, a Vietnam veteran and one of the passengers on the plane, became the hero, Skull the Slayer.

### 4. *Blade and Deacon Frost*

In 1973, Marvel published "The Tomb of Dracula" issue number ten, the first comic featuring the character Blade, the Vampire Hunter. In the same year, in issue number thirteen of "The Tomb of Dracula," Wolfman and Marvel introduced the Deacon Frost character and the origin story of Blade.

Wolfman testified, that despite the publication dates for Blade and Deacon Frost, he wrote the origin story for these characters in 1972, prior to the beginning of his relationship with Marvel. According to Wolfman, he wrote a story of approximately half a page in length describing the origin story and the look of Blade and Deacon Frost. Wolfman testified that he never spoke to anyone about the origin story for fear that someone else would steal or dilute his ideas for the character. Wolfman could not produce the half-page origin story at trial.

As depicted in "The Tomb of Dracula," Blade was a character that hunted and exterminated vampires. His mother, an African American, was bitten by the vampire Deacon Frost while she was giving birth to Blade. As a result of this vampire bite, Blade developed an immunity to future vampire bites. In addition to hunting vampires generally, Blade's specific mission was to avenge the death of his mother and kill Deacon Frost.

---

**2.** Wolfman testified that "Declining Competition" was a code to Marvel readers that the author meant DC Comics.

Wolfman stated that the motivation for the Blade character derived from several sources. First, Wolfman testified that he had wanted to create a black character since he worked at DC Comics. Wolfman stated that the editors at DC Comics had rejected his idea for adding a black hero to the Teen Titans, a super hero team. Because of the racial unrest and his life in New York City, Wolfman felt that a black hero would be the appropriate response for the comic industry. Wolfman testified that despite DC Comic's rejection, he still wanted to create a black hero.

Second, Wolfman testified that his interest in the horror genre piqued his interest in creating a new type of vampire hunter. Wolfman stated at trial, "It was one of those two times in my life that the character was absolutely crystal-clear in my head. I knew what [Blade] looked like. I knew his origin. I knew the story. I knew what he was going to do."

Wolfman testified that he had fully developed the look of Blade in his origin story. Wolfman stated that his story contained a description of his costume, his sunglasses, his weapons, and his aversion to sunlight. Wolfman further testified that Gene Colan, the artist with whom Wolfman worked on "The Tomb of Dracula," called him several times to make sure that the rendering of Blade for issue number ten of "The Tomb of Dracula" would mesh exactly with the character that Wolfman had envisioned.

Marvel argues that Wolfman's account of the development of Blade and Deacon Frost is belied by his previous statements and the deposition testimony of Colan.

First, Marvel points to an interview given by Wolfman in 1997 to "Cinefantastique" Magazine to show that Wolfman developed Blade after he began writing for Marvel. Dale Kutzera, the author of the article, quotes Wolfman as saying, "I was assigned to do book seven [of "The Tomb of Dracula"]. A couple of issues later Blade just came to me." Kutzera testified that the quote in the article was a direct an unaltered quote from his interview with Wolfman.

Second, Marvel points to deposition testimony given by Gene Colan. Colan stated that Wolfman did not create the Blade character until after the two of them had collaborated on earlier issues of "The Tomb of Dracula."

Lastly, Marvel compares Wolfman's early deposition testimony with his trial testimony to suggest that Wolfman did not actually create Blade prior to his freelance agreement with Marvel. At his deposition, Wolfman testified as follows:

Q: And when did you create the character Blade?

A: Spring of '72.

Q: Was the character Blade written into a storyline for a Marvel publication or a publication of someone else?

. . .

A: No. No, it was not written into a Marvel publication or other publication at the time I created it. I was not working at Marvel when I created it.

Q: Was the character created as part of a story?

A: No.

Q: Was it created in written form?

A: I don't recall.

Marvel argues that this deposition testimony contradicts and casts doubt upon Wolfman's statement at trial that he wrote a half-page origin story in early 1972 prior to his relationship with Marvel.

In 1993, Marvel granted Katja Picture Corporation the right to produce one or more live action movies based on Blade. Katja Picture assigned its rights to New Line Cinema Corporation. In 1998, New Line Cinema produced and distributed a film based on the Blade story.

### 5. Characters Created From Late 1972 until December 31, 1976

The parties agree that Wolfman developed the majority of the characters in this dispute after he began freelance work for Marvel. The following characters appeared in a variety of Marvel titles over a five year period from late 1972 until December 31, 1976. While employed by Marvel and prior to signing the 1977 Writer/Editor Agreement Wolfman created Doctor Mortte, Doctor Sun, Edith Harker, Quincy Harker, Saint the Dog, Safron DeVille, Father Josiah Dawn, Gorna, Horatio Tombs, Lilith, Lord Turac, Piranha, Azu, Bullseye, Hannibal King, Musenda, Ogun, Orji, Mind–Wave, Torpedo, Anton Lupeski, Aurora Rabinowitz, Braggadoom, Domini, Harold H. Harold, Juno, Big Brother, Cheshire Cat, Ginger Jaye, Goldbug, Mike Burley, Richard Ryder, Thunderbolt, Charles Ryder, Gloria Ryder, Nova Prime, Donna–Lee Dover, Bernie Dillon, Roger Cooper, Powerhouse, The Condor, Diamondhead, The Corruptor, Earthshaker, The Sphinx, Sayge, Megaman, and Xander.

### 6. Characters Created After January 1, 1977

The parties agree that Wolfman developed The Forever Man, Jessica Drew, Excalibur, Brothers Grimm, Hangman, The Binary Bug, The Horsemen, Terrax, The Firefly, Photon, Blackout, The Inner Circle, Comet, The Monitors, The Big Wheel, White Dragon, and The Black Cat after Wolfman and Marvel entered into the 1977 Writer/Editor Agreement.

## II. DISCUSSION

Marvel argues that it owns the rights to all of the characters that Wolfman created while employed by Marvel. Marvel contends that under the Copyright Act of 1909, the characters produced prior to January 1, 1977 were works made for hire and thus the property of Marvel. Marvel further argues that the characters that Wolfman created after January 1, 1977 are covered by the 1977 Writer/Editor Agreement and thus belong to Marvel.

Wolfman disagrees. First, he contends that the work for hire doctrine is not applicable to any of the characters that he produced while at Marvel. He further contends that the 1977 agreement does not control the disposition of the characters at issue.

### A. Applicable Law

The Copyright Act of 1909 governs works created prior to January 1, 1978, the date on which the Copyright Act of 1976 took effect. The Copyright Act of 1909 only mentions "work made for hire" in the definition section of the statute. There, Congress stated that "the word 'author' shall include an employer in the case of works made for hire." 17 U.S.C. § 26 (repealed). "Under this definition, an 'employer' who hires another to create a copyrightable work is the 'author' of the work for purposes of the statute, absent an agreement to the contrary." *Playboy Enterprises, Inc. v. Dumas,* 53 F.3d 549, 554 (2d Cir.1995). *See also Easter Seal Society for Crippled Children and Adults of Louisiana, Inc. v. Playboy Enterprises,* 815 F.2d 323 (5th Cir.1987); *Siegel v. National Periodical Publications, Inc.,* 508 F.2d 909 (2d Cir.1974). The presumption of ownership in favor of the employer extends to work created by independent contractors as well as work by employees. *See Brattleboro Publishing Co. v. Winmill Publishing Corp.,* 369 F.2d 565, 567 (2d Cir.1966).

If the employer can meet its burden to show some credible evidence that an employee worked at the "instance and expense" of the employer, then the court will presume that the employer holds the copyright to the material produced. *See Dolman v. Agee,* 157 F.3d 708, 712 (9th Cir.1998); *Siegel,* 508 F.2d at 914; *Brattleboro Publishing Co.,* 369 F.2d at 567. As the Second Circuit explained, the "[work made for hire] doctrine is applicable only when the employee's work is produced at

the instance and expense of the employer, ... or, in other words, when the 'motivating factor in producing the work was the employer who induced the creation.'" *Siegel*, 508 F.2d at 914 (citations omitted). The Fifth Circuit further construed the instance and expense test expressed in *Siegel* stating that courts must also consider "whether the employer had the right to direct and supervise the manner in which the work was being performed. Actual exercise of that right is not controlling, and copyright is vested in the employer who has no intention of overseeing the detailed activity of any employee hired for the very purpose of producing the material." *Murray v. Gelderman*, 566 F.2d 1307, 1310 (5th Cir.1978) (citations omitted). The employee may not circumvent the work made for hire doctrine even where an artist has contracted for complete artistic control of her work. *Id.*

■ The employee or independent contractor can rebut the presumption by showing that the parties entered into an agreement "by which the employee or independent contractor retained the copyright in his work." *Dolman*, 157 F.3d at 712.

### B. *Rights to the Characters in Claim 342*

As a threshold matter, Marvel argues that because Wolfman had to produce new scripts as part of his responsibilities as a freelance writer, any characters that he created as a part of those scripts were made at Marvel's instance and expense. According to Marvel, Wolfman had to introduce new characters and new plot lines to the scripts in order to keep the stories interesting and readers entertained. Thus, Marvel argues that Wolfman's obligation to create scripts for Marvel motivated Wolfman to create new characters.

First, citing *Playboy Enterprises, Inc. v. Dumas*, 53 F.3d 549, 554 (2d Cir.1995), Wolfman argues that because he worked without supervision, worked with his own materials, and oversaw the work done on certain comics, he should retain the rights to all of the characters he developed. Second, Wolfman argues that absent an express agreement transferring his rights in the characters to Marvel, the court should find that Wolfman retains the rights to his characters. Lastly, citing *Siegel v. National Periodical Publications, Inc.*, 508 F.2d 909 (2d Cir.1974), Wolfman contends that because he developed Nova, Janus, Skull the Slayer, Blade, and Deacon Frost prior to his employment with Marvel, the characters were not made at Marvel's instance and expense.

Marvel disagrees. Marvel contends that it retained the right to review and edit all scripts produced by Wolfman, even when it did not exercise that right. Second, Marvel contends that the *Siegel* exception should not apply to the five characters Wolfman claims he created prior to his employment with Marvel. Lastly, Marvel argues that without an express agreement to the contrary it retains rights to all of the characters produced as works made for hire.

### 1. *Did Wolfman Create Characters at Marvel's Instance and Expense?*

Marvel contends that it motivated and induced Wolfman to contribute plots and scripts to its comic books. Further, Marvel argues that Wolfman had to introduce new characters into the scripts that he generated in order to adequately perform his job. Thus, according to Marvel, it motivated and induced Wolfman to create the characters in dispute within the instance and expense test.

Citing *Playboy Enterprises, Inc. v. Dumas*, 53 F.3d 549 (2d Cir.1995), Wolfman contends that Marvel's payment per comic book page to contribute plots and themes does not constitute a payment for the creation of original characters. Second, Wolfman argues that Marvel's general request that Wolfman provide plots and themes to the publisher does not satisfy the instance and expense test. Lastly, Wolfman contends that Marvel's lack of supervision of

830

his work indicates that he did not produce the characters at Marvel's instance and expense.

■ Regardless of whether an artist is an employee or an independent contractor, where an employer pays an artist a sum certain for his or her work, the artist has produced at the employer's expense. *See Dumas*, 53 F.3d at 555; *Brattleboro*, 369 F.2d at 568. In contrast, where an employer pays an artist a royalty for his or her work, courts have found that this mitigates against finding that the parties had a work-made-for-hire relationship. *See Dumas*, 53 F.3d at 555. Here, Marvel paid Wolfman a flat fee per page of copy that Wolfman provided. Marvel expected Wolfman to produce fresh stories that would include new plots and characters. Thus, the court finds that Wolfman produced this work at Marvel's expense.

■ Wolfman contends that even if he produced the characters at Marvel's expense, he did not act at Marvel's instance. When an employer motivates or induces an artist to create a work, the artist produces that work at the employer's instance. *See Siegel*, 508 F.2d at 914. Further, if an employee gives an artist specific assignments or asks the artist to create particular works, the artist works at the employer's instance. *See Dumas*, 53 F.3d at 556. Wolfman contends that Marvel merely made general requests for scripts and plots. This, he claims does not satisfy the instance prong. The court disagrees. Marvel asked Wolfman to produce scripts and ideas for specific comic book titles. An employer need not control or mandate the content of an artist's creation to make a specific request. *See, e.g., Dumas*, 53 F.3d at 556 (finding that an artist worked at Playboy's instance when the company requested that the artist work on "specific assignments" and "illustrate particular articles"). Thus, Marvel's request that Wolfman create story ideas for certain comic titles satisfies the instance test.

Lastly, the court finds that Marvel reserved the right to supervise Wolfman's work. Even for the period that Wolfman served as Editor–In–Chief at Marvel, someone else at Marvel retained the right to review all of Wolfman's scripts and art. Marvel need not exercise that right to prove that Wolfman acted at the company's expense. *See Murray*, 566 F.2d at 1310 (holding that actual exercise of supervisory rights does not control in an instance and expense analysis).

Thus, the characters Wolfman created while employed by Marvel were made at Marvel's instance and expense.

2. *Was Marvel the Motivating Factor in the Production of Nova, Janus, Skull the Slayer, Blade, and Deacon Frost?*

■ Wolfman makes a further argument with regard to the characters that he claims he created prior to 1972. Relying on *Siegel*, Wolfman claims that he produced Nova, Janus, Skull the Slayer, Blade, and Deacon Frost prior to his employment with Marvel and thus the development of the characters was not motivated by Marvel.

In *Siegel*, the Second Circuit reviewed a district court's determination of renewal rights for the copyright of the Superman character. *See* 508 F.2d at 914. The district court found that the plaintiffs created the Superman character in 1933 and shortly thereafter developed a comic strip with several weeks worth of material based on Superman. Some of the strips were completely drawn and colored, others were merely penciled, but all were nearly ready for publication. At that time, plaintiffs submitted comic strips to a number of publishers. In 1937, plaintiffs signed an agreement with one of their customers, Detective Comics, promising an exclusive contract for two comic strips and the right of first refusal on any other strips the plaintiffs developed. Only in 1938 did the plaintiffs first submit the Superman strips for publication. Detective Comics agreed and asked plaintiffs to expand the materi-

als into a format suitable for publication in a magazine.

The Second Circuit reversed the district court's holding that Superman was a work made for hire under the Copyright Act of 1909 finding that "Superman and his miraculous powers were completely developed long before the employment relationship was instituted." *Siegel*, 508 F.2d at 914. Moreover, the appellate court noted that the plaintiffs had not made any substantial changes to the original 1933 strips, and that "revisions directed by the defendants were simply to accommodate Superman to a magazine format." *Id.* Thus, the Second Circuit held that the publisher was not the "motivating factor in producing the work."

Wolfman argues that, like the plaintiffs in *Siegel*, he had fully developed Nova, Janus, Skull the Slayer, Blade, and Deacon Frost prior to using these characters at Marvel. Marvel counters arguing that *Siegel* creates a narrow exception to the instance and expense test. Further Marvel argues that this exception does not apply to these characters and the court should follow the general presumption that an employer is the author of works made for hire.

Marvel contends the Nova, Janus, and Skull the Slayer characters that Wolfman claims are protected prior expressions are different from the characters Wolfman produced with the same names while at Marvel. Therefore, according to Marvel, these characters do not fall within the *Siegel* exception. Marvel further argues that Wolfman failed to establish that copyrightable versions of Blade and Deacon Frost existed prior to the time that Marvel motivated Wolfman to create them. Thus, according to Marvel, Blade and Deacon Frost also do not fall with the *Siegel* exception to the work made for hire doctrine.

#### a. *Nova*

There are some similarities between the Black Nova character produced in Wolfman's fanzine and the Nova character produced in Marvel's "A Man Called Nova" such as name and costume. The bulk of the storyline, however, is vastly different. First, and most notably, the origin stories of the two characters are not similar. Black Nova was created when an alien villain split a super hero named Star into two entities. By contrast, Nova was not created during battle, but as a result of a search for a successor hero by the Centurion, Nova Prime. The background stories are equally disparate. Black Nova has no clearly defined mission; he is simply a hero. In contrast, Nova has both general crime fighting duties and a distinct mission, to avenge the destruction of the Centurion's home planet.

Lastly, the powers of the two characters are not similar. Black Nova's powers derive from the fusion of Star's power pills into the newly created hero's system. Black Nova lacks the power of flight; he depends on his sky skates to fly through the air. In contrast, Nova's powers derive from the Centurion's gift. Nova, also called the human rocket, clearly has the power of flight. These are more than trivial distinctions. Wolfman argues that writers modify all hero's powers over time. In this case, however, the power of flight, or lack thereof, is central to both character's story line.

Thus, the court finds that Wolfman had not fully developed Nova prior to the use of the character in 1976 in the comic "A Man Called Nova." Wolfman made more than superficial changes to the character from 1967 to 1976. The court finds that the extent of the modification renders the 1976 Nova an entirely separate character from the 1967 incarnation. Thus, Nova cannot fall within the *Siegel* exception.

#### b. *Janus*

Like Nova, there are significant differences between the 1970 script of Janus and the 1977 version of Janus in "The Tomb of Dracula." The 1970 Janus script tells the story of a son, Janus, rebelling against his father Asmodeus, the Devil. In contrast, although the 1977 Janus is nominally the

832

son of Dracula, the agent of God that entered Dracula's unborn son appears to be the motivating factor for Janus's rebellion.

The basic premise of the characters is also quite different. The 1970 Janus grew up around his father, Asmodeus. He learned compassion from his mother, a mortal. The 1977 Janus is an agent of God transferred into a child that reached adulthood in less than a week. This character's compassion appears to come from a divine source.

Both characters are light skinned, with white hair and red eyes, but the costumes of the two characters are different. Wolfman described the 1970 Janus as having a reddish brown costume. The 1977 Janus has a white and blue costume. Unlike the 1970 character, the 1977 Janus does not carry a sword.

There are similarities in the underlying plot and characters: rebellion against father, mortal mother, battles with evil creatures. These similarities, however, do not suggest that the two characters are one in the same. The court finds that Wolfman reworked the 1970 storyline to create a new character for the 1977 publication. Thus, this character also does not fall within the scope of *Siegel.*

### c. *Skull the Slayer*

Wolfman has not provided the court with enough evidence to show that he had completely developed Skull the Slayer prior to the Marvel's publication of the comic "Skull the Slayer". Thus, this court finds that this character does not fall within the scope of *Siegel.*

Even assuming that the statements on the letter page of the 1975 "Skull the Slayer" comic are true, Wolfman did not show that he had fully developed the character Skull the Slayer prior to the Marvel publication. First, in contrast to the publication-ready Superman comic strips in *Siegel,* Wolfman had little more than a concept for the character Skull the Slayer when he proposed the comic to the editor-in-chief at DC Comics. Second, like Nova and Janus, the story that Wolfman proposed to DC Comics differs from the story published by Marvel. Thus, Skull the Slayer does not fall within the *Siegel* exception. *Cf. Kodadek v. MTV Networks, Inc.,* 152 F.3d 1209, 1211 (9th Cir.1998) (upholding a grant of summary judgment on a copyright infringement claim where the plaintiff could not produce an original work of art to contrast with the allegedly infringing art).

### d. *Blade and Deacon Frost*

Wolfman has likewise not provided the court with sufficient evidence to show that he developed Blade and Deacon Frost prior to the publication of "The Tomb of Dracula" issue number ten.

In *Siegel,* the plaintiffs completely developed several Superman comic strips prior to the plaintiffs sale of their work to Detective Comics. There, the court found that the strips were ready or nearly ready for publication.

Here, Wolfman merely had a nascent idea for a character and story. Even assuming that Wolfman produced a half-page write up of the character's background and look, Wolfman had not completely developed the characters of Blade and Deacon Frost as the plaintiffs had in *Siegel.* Wolfman's *Siegel* argument does not account for the transition from a story idea to a story ready for publication. Wolfman spent time and energy while employed at Marvel developing a script with proposed panel art and text for "The Tomb of Dracula." Wolfman performed this work at the instance and expense of Marvel. Thus, even if this court assumes that Wolfman had produced a half-page origin story of Blade and Deacon Frost, that story and those characters do not fall with the ambit of the *Siegel* exception. *Cf. Kodadek,* 152 F.3d at 1211.

### 3. *Was There an Express Agreement Protecting Wolfman's Interest in The Characters That He Created?*

 Wolfman contends that even if he made all of the disputed characters at

Marvel's instance and expense, he should retain the rights to the characters because he believed at the time that he would retain control over the characters. This argument is in direct conflict with clearly established law. "Once it is established that a work is made for hire, the hiring party is presumed to be the author of the work. That presumption can be overcome, however, by evidence of a contrary agreement, either written or oral." *Dumas,* 53 F.3d at 554.

### a. *Prior to January 1, 1977*

■ Prior to signing the Writer/Editor Agreement in 1977, Wolfman and Marvel did not reduce to writing any agreement regarding the ownership of characters. Thus, unless Wolfman can show that he and Marvel had an oral agreement regarding the ownership of the characters, Marvel will retain the rights to the disputed characters.

Marvel points to several business practices as evidence that it had an expectation that it retained the rights to the work that its employees created. First, Marvel points to the legends that it produced on the back of payroll checks. According to Marvel, the legends represent Marvel's intention to put its employees on notice that it owns the work for which it paid its artists. Marvel further points to the releases that artists had to sign to regain copies of their original artwork as evidence of Marvel's intention to retain the copyright and ownership of its artists work. Wolfman has not provided the court with any evidence suggesting that he and Marvel agreed about the ownership of the disputed characters.

At a minimum, the court finds that the parties had not reached an agreement that this court could enforce regarding the rights to the characters. Without an enforceable agreement, the court will revert to the presumption that the employer is the author of works made for hire. Therefore, the court holds that Marvel is the author of all of the characters that Wolf-man produced prior to January 1, 1977 while employed by Marvel.

### b. *After January 1, 1977*

Wolfman continued to produce characters at Marvel until he stopped working for the publisher in 1979. On January 1, 1978 the Copyright Act of 1976 took effect. Prior to that time, however, in late 1976 or early 1977, Wolfman and Marvel entered into the 1977 Writer/Editor Agreement. Wolfman's work under this agreement is covered in part by the 1909 Act and in part by the 1976 Act.

Under the 1909 Act, the Writer/Editor Agreement does not change the underlying presumption that Marvel is the author and copyright holder of the characters Wolfman created while employed by Marvel. As stated above, unless Wolfman can show that he and Marvel entered into an agreement that granted Wolfman the rights to the characters, the court will presume that Marvel is the author of the works. The court finds that the Writer/Editor Agreement does not change that presumption.

■ Under the 1976 Act, a court will also presume that the employer is the author of works made by an employee within the scope of the employee's employment. *See Community for Creative Non–Violence v. Reid,* 490 U.S. 730, 738, 109 S.Ct. 2166, 104 L.Ed.2d 811 (1989). The definition section of the 1976 Act states that "A 'work made for hire' is (1) a work prepared by an employee within the scope of his or her, employment." 17 U.S.C. § 101. If the work is made for hire, " 'the employer or other person for whom the work was prepared is considered the author' and owns the copyright unless there is a written agreement to the contrary." *Community for Creative Non–Violence,* 490 U.S. at 737, 109 S.Ct. 2166 (quoting 17 U.S.C. § 201(b)).

■ The 1977 Writer/Editor Agreement embodies several ideas. First, the agreement changes Wolfman from a freelance employee to a full-time employee of

**834**

Marvel. Second, it sets the scope of Wolfman's employment. Lastly, it purports to grant rights in Wolfman's work to Marvel. The court finds that Wolfman was an employee after January 1, 1977 within the meaning of the 1976 Act and that he created all of the characters after January 1, 1977 within the scope of this agreement.

Unless Wolfman can show an agreement to the contrary, the court must find that Marvel owns the copyright to those characters. It is clear from the Writer/Editor Agreement that Marvel intended that it should retain ownership over all of the material including characters that Wolfman would create. Thus, Wolfman cannot show that an agreement existed that vested to him the rights to the material he created.

For these reasons, the court finds that under both the 1909 and 1976 Copyright Acts, Marvel is the author and owner of characters created after January 1, 1977.

### III. *CONCLUSION*

For the above mentioned reasons, the court will disallow Wolfman's proof of claim and uphold the debtor's objection to Claim 342. The court further holds that the characters Wolfman created while employed by Marvel were made at Marvel's instance and expense and are, therefore, works made for hire. Because Wolfman could not show an agreement to the contrary, the court finds that Marvel is the author of all of the characters in dispute in Claim 342 under both the Copyright Act of 1909 and the Copyright Act of 1976. The court will enter an order in accordance with this opinion.